E-FILED
Monday, 20 July, 2020  05:54:29 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| WALTER THOMPSON<br>on behalf of<br>JANET THOMPSON, deceased,<br><br>Plaintiff,<br><br>v.<br><br>ANDREW SAUL,<br>Commissioner of Social Security,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 19-cv-3132 |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Walter Thompson appeals from the denial of his deceased wife Janet Thompson's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act.  42 U.S.C. §§ 416(i), 1381a and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).   Walter Thompson filed a Brief in Support of Motion for Summary Judgment (d/e 15).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 19).  Thompson filed a Reply Brief (d/e 20) to respond to Defendant's Motion for Summary Affirmance. The parties consented to proceed before this Court.  Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order

entered October 4, 2019 (d/e 13).  For the reasons set forth below, the Decision of the Commissioner is AFFIRMED.

## STATEMENT OF FACTS

The deceased claimant Janet Thompson (hereinafter Thompson) was born on April 24, 1969.  She secured a GED and completed an associate degree.  She previously worked as a cook in a restaurant and had not worked since the date that she applied for SSI on July 14, 2014.  She suffered from multiple sclerosis (MS), degenerative disc disease, epilepsy, and depression.  She died on May 29, 2016 due to an accidental overdose of her prescription medications.  Walter Thompson was timely substituted in as her surviving husband and a person entitled to receive underpayments of benefits that may be owed to Thompson.  Certified Transcript of Proceedings before the Social Security Administration (d/e 9) (R.), 15, 18, 27,30, 44, 68; see 20 C.F.R. 416.542(b) (authorizing underpayments of benefits to surviving spouse of deceased claimant).

On September 22, 2013, Thompson completed a Function Report-Adult form (Function Report) R. 178-85.  Thompson said that as a result of her physical impairments, she moved more slowly, became off-balance, was weaker, and became tired more easily.  R. 178.  Thompson said that in a typical day, she got up, watched television, cleaned, did laundry, and

prepared meals.  She took rest periods during the day and took care of their dogs with the help of her mother and her daughters.  She could not stand for a long period of time, she had trouble putting on socks, and she had trouble getting in and out of the bathtub.  R. 179.  She needed reminders to take showers and to take her medication.  Twice a week she prepared complete meals with several dishes.  She took about two hours to prepare complete meals.  She did laundry and used the riding lawnmower to mow the lawn, resting periodically.  R. 180.  Thompson drove.  She shopped for groceries once a week for an hour at a time.  Her hobbies were reading, writing, and sitting outside with her dogs.  She did not engage in her hobbies often because she had no energy anymore.  She went to the doctor's appointments by herself but needed to be reminded of her appointments.  Her impairments affected her ability to lift, squat, stand, bend, walk, kneel, reach, climb stairs, remember, concentrate, and use her hands.  She could lift five to 10 pounds and walk half a block before she needed to rest for five minutes.   R. 181-83.  She followed written instructions "perfect,"  but she forgot oral instructions and did not get along with authority figures.  She handled stress well and changes in routine well. R. 183-84.  Thompson used glasses to read daily.  R. 184.

On November 18, 2013, Thompson saw Dr. RaNae Stanton, M.D., for depression.  R. 329-30.  Thompson reported that she was experiencing symptoms of decreased energy, anhedonia, and increased sleep and wanted counseling.  On examination, Thompson's mood and affect were depressed.  Her orientation, memory, attention, language, and fund of knowledge were normal.  R. 330.  Dr. Stanton adjusted Thompson's antidepressant medication and referred her for counseling.  R. 329.

On December 27, 2013, Thompson had x-rays of her left hip and lumbar spine.  She stated that she fell on some ice.  The hip x-ray showed no fracture or dislocation.  The lumbar spine x-rays showed mild space narrowing from T11-T12 through L4-L5 with no fractures and minimal retrolisthesis of L3 on L4.  R. 404-05.

On December 30, 2013, Thompson saw her primary care physician Dr. Robina Iqbal, M.D., for a follow up after her emergency room visit.  R. 515-19.  She was taking hydrocodone for the pain.  Dr. Iqbal noted that she advised Thompson in October 2013 to take calcium for osteopenia, but Thompson had not done so.  R. 515.  On examination, Thompson had a normal gait, no joint swelling, and normal movement in all extremities.  She was oriented, her insight and judgment were intact, and her affect was normal.  R. 517.  Dr. Iqbal prescribed hydrocodone for the pain.  Dr. Iqbal

previously advised Thompson to decrease her caffeine intake significantly due to acid reflux, but she had not done so.  Dr. Iqbal reiterated that advice. R. 518-19.

On January 10, 2014, Thompson saw Dr. Stanton.  R. 325-26. Thompson said that her anxiety symptoms were improving.  She was compliant with the medication and psychotherapy.  Dr. Stanton noted fair symptom control by report.  R. 325.  On examination, Thompson's affect was normal, and her mood was normal.  R. 326.

On January 15, 2014, Thompson saw state agency psychologist Dr. Frank Froman, Ed.D., for a mental status examination.  R. 368-71.  Dr. Froman noted that Thompson had MS and had recently been released from prison.  She was married, but she was staying with her mother because she was subject to monitoring under the terms of her parole and her mother's residence could accommodate the requirements for monitoring.  On examination, Thompson was oriented and in good contact with reality.  Dr. Froman estimated Thompson to have an average IQ.  Dr. Froman opined that Thompson was depressed and assessed moderate major depressive disorder, single episode.  R. 369-71.  Dr. Froman concluded:

> **CONCLUSIONS:**  It is unlikely that Janet would be able to sustain a competitive rate in performing any activities.  In all

probability, her work effort would be marred by her limitations in physical function.

She is able to relate modestly to co-workers and supervisors. I believe that she can understand oral and written instructions and manage benefits. It is unlikely that, given her total picture, that she would be able to withstand the stress associated with customary employment.

R. 371.

On January 16, 2014, Thompson had an MRI of her brain and an MRI of her cervical spine. The results of the MRI of her brain was suspicious demyelinating plaques of MS in part of the brain and likely for a demyelinating plaque in another part of the brain. R. 406. The MRI of her cervical spine showed no indication of demyelinating plaques of MS. The MRI of her cervical spine also showed no disc herniations and disc protrusions at C5-C6 and C4-C5 that were smaller than in previous studies. The MRI showed no cord compression. R. 408.

On January 27, 2014, Thompson saw neurologist Dr. Walid Hafez, M.D., for a follow up on her MS. Her mother went with her. Thompson said she was "OK" except for an episode a few weeks earlier when she was off-balance. She was standing next to the refrigerator and held onto the refrigerator when she became off-balance. Her daughter walked her over to a recliner and her hands and legs started to shake. She thought that the episode might have been a seizure, but she was not sure.

Thompson's mother said that during the episode, Thompson could answer questions, but her hands shook.  Her mother reported that Thompson fell twice in the past week.  Thompson asked for pain medication.  R. 510.

On examination, Thompson was 5 feet 8 inches tall, weighed 211 pounds, and had a body mass index (BMI) of 32+.  Dr. Hafez found that Thompson's sensation was preserved, she could transfer from sitting to standing and ambulate on her own.  She was cautious when walking and "somewhat  unsteady on turns."  Her Romberg test was negative and her finger to nose coordination was normal.  R. 513.[1]  Dr. Hafez assessed MS, loss of balance from MS, weight gain, and complex partial seizures still recurring and recommended a fitness program and education on healthy nutrition.  Dr. Hafez prescribed steroids for her MS.  R. 514.  Dr. Hafez also recommended an EMG/nerve conduction study of her lower extremities.

On February 7, 2014, Thompson had a CT scan of her lumbar spine and an electroencephalogram (EEG).  The CT scan showed facet arthropathy, minimal bulges at L2-L3 and L4-L5, and moderate stenosis at L2-L3, L3-L4, and L4-L5.  The EEG findings were "mild and meager" and

---

[1] Romberg's sign is a test of  balance with feet close together and eye closed.  See Dorland's Illustrated Medical Dictionary (32nd ed. 2012) (Dorland's), at 1715.

not enough to support a diagnosis of a focal dysfunction or a seizure disorder.  R. 412-13.

On February 11, 2014, Thompson went to the emergency room at Blessing Hospital in Quincy, Illinois.  She reported having diarrhea for four days, was dizzy, shaky, light-headed, and near syncope.  She reported falling and hitting her head.  R. 445.  A head CT scan and chest x-ray were negative.   She was oriented with normal mood and affect, normal sensation, and full range of motion in her extremities.  She had mild tenderness in her neck.  She was treated and released from the emergency room.  R. 446.

On February 14, 2014, Thompson saw state agency physician Dr. Raymond Leung, M.D., for a consultative examination.  R. 373-76. Thompson stated that she was diagnosed with MS in October 2012.  She had balance problems and she could fall.  She did not use a cane or walker to ambulate.  Her hands sometimes got shaky and she had some problems with short-term memory.  She could walk a block and lift 10 pounds.  R. 373.

On examination, Thompson was 69½ inches tall and weighed 210 pounds.  She walked with a limp and could walk 50 feet without assistance. She could hop, tandem walk, heel walk, and toe walk.  She could squat but

needed help getting back up.  She had decreased range of motion in her cervical spine.  She had no muscle atrophy or spasms.  She could oppose her thumb with each finger and has 5/5 pinch, arm, leg, and grip strength. She got on and off the examination table without difficulty.  She had normal sensation and she could manipulate small objects "fairly well."  R. 375.

On February 19, 2014, Thompson had an EMG/nerve conduction study.  She had reported numbness and pain in her left leg from the knee up.  R. 503.  The study was "all in all benign."  R. 504.

On February 20, 2014, Thompson saw nurse practitioner Daveda Voss, NP, at Blessing Hospital for a Pain Management consultation. Thompson reported pain in her lower back, left thigh, and left knee.  The pain occurred daily and ranged from 6/10 to 9/10.  Voss administered screening tests that indicated moderately severe depression and "exceedingly high risk of opioid misuse and abuse."  R. 384.

On examination, Thompson had an essentially steady gait.  Her joints had age-appropriate range of motion.  She was deconditioned, but her hand grips, shoulder shrugs, and forearm pushes and pulls were equal bilaterally and "fairly strong in nature."  Straight leg raising test was negative.  She had tender points over her lumbosacral, trapezial, and both hips.  Her axial load and truncal rotation were positive.  She had a flat

mood and affect and denied any hallucinations or suicidal or homicidal ideations.  Voss assessed chronic low back pain and left hip and knee radiculopathy.  R. 385.  Voss recommended improved sleep hygiene and exercise.  Voss emphasized the importance of cardiovascular exercise and ordered physical therapy to work on core strengthening and toning.  Voss also recommended water exercise.  She gave Thompson a form to apply for a scholarship to pay for a membership at the YMCA to use the pool. Voss referred Thompson to licensed clinical social worker Bridget Ormond for counseling.  Voss recommended continuing her current prescriptions of gabapentin and hydrocodone and she added a muscle relaxant Baclofen. She said that hydrocodone should not be the "cornerstone" of Thompson's pain treatment plan.   R. 386.

On February 28, 2014, Thompson had an EEG.  The test showed some mild abnormalities that were not sufficient to diagnose a seizure disorder.  R. 421.

On March 20, 2014, Thompson saw Voss.  Thompson said she had no improvement.  She had been going to physical therapy twice a week. She walked her dog in the yard, but she did not engage in any "cardiovascular level activity."  She admitted taking extra hydrocodone tablets beyond what was prescribed and also admitted taking her mother's

prescription medication alprazolam (Xanax) to help her sleep.  Her pain ranged from a 5/10 to a 9/10.  Voss' screening test indicated mild depression.  R. 391.

On examination, Thompson's gait was essentially normal.  Her musculature was deconditioned, but her hand grips, shoulder shrugs, and forearm pushes and pulls were equal bilaterally and "fairly strong."  Straight leg raising test was negative.  She had tender points over her lumbosacral, trapezial, and both hips.  Voss told Thompson she had to walk every day. R. 391.   She again told Thompson to complete the application for the scholarship to the YMCA to begin water exercises and to perform the home exercise program that she had received.  R. 392.  Voss also increased her gabapentin and baclofen but would not refill her hydrocodone until March 22, 2014.  She told Thompson to limit herself to two hydrocodone pills a day.  Voss also ordered a TENS unit for Thompson.   R. 392.

On the same day, March 20, 2014, Thompson also saw social worker Ormond. 394-95.  Thompson said that overall she was doing okay.  Her stress was down because she was no longer under house arrest and was taken off parole.  She stated that she took her mother's Xanax to help her sleep.  Ormond warned her not to take medication that was not prescribed to her and warned of the risk of addiction to Xanax.  Ormond also talked to

Thompson about her activity levels.  Ormond recommended joining the YMCA to use a heated swimming pool for exercise.  Thompson had an application for financial assistance at the YMCA and would fill it out and turn it in on her own.  R. 395.

On May 1, 2014, Thompson saw nurse practitioner Voss.  R. 396-98. Thompson had reported to Voss that her hydrocodone prescription had been stolen, but she did not file a police report.  She reported difficulties taking gabapentin and baclofen.  Voss noted that Thompson did not have any trouble taking hydrocodone or her mother's Xanax prescription. Thompson also reported that she got medication at a "street pharmacy" and she smoked marijuana.   R. 396.

Thompson's pain was located in her lower back down her left leg to her knee.  She hurt her knee when she went mushroom hunting.  R. 396. Thompson had been prescribed water therapy, but she had not followed through with the therapy.  She had followed through with seeing licensed clinical social worker Ormond.  Voss noted that Ormond administered some tests to Thompson.  The tests indicated mild depression and "exceedingly high risk of opioid misuse and abuse."  R. 396.

On examination Voss observed that Thompson was alert and oriented.  Her gait was essentially stable without any limp or abnormality.

Her musculature was deconditioned.  Her "hand grips, shoulder shrugs,

forearm pushes and pulls. foot pushes and pulls, leg lifts, leg

kicks, [were] equal bilaterally and fairly strong."  Thompson's affect and

mood were flat; she denied any depression; and she denied any

hallucinations, suicidal ideations, or homicidal ideations.  R. 397.  Voss

emphasized to Thompson the need to engage in cardiovascular exercise.

Voss also recommended that Thompson continue to see counselor

Ormond.  R. 397.

On May 15, 2014, Thompson saw Voss.  Thompson stated that she

did not attend scheduled physical therapy sessions, sessions with social

worker Ormond, or counseling sessions with her therapist that she began

seeing while on parole.  Her drug screening test was positive for marijuana

and opioids, and possibly oxycodone and benzodiazepines.  Thompson

reported she walked her dog once a day for 10 to 15 minutes and her pain

ranged from 6/10 to 10/10.  It was 8/10 at the visit.  R. 399.   On

examination, her gait was stable without any limp or abnormality, her

muscles were slightly deconditioned, her hand grips, shoulder shrugs,

forearm pushes and pulls, foot pushes and pulls, leg lifts, and leg kicks

were equal and fairly strong bilaterally.  R. 399.  Thompson's affect was

flat, and her mood was "fairly okay."  She denied any significant depression

and denied any suicidal or homicidal ideations.  R. 400.  Voss did not

change Thompson's medications.  She strongly urged Thompson to

acquire a TENS unit and let physical therapy assist her with it.  R. 400.

On May 29, 2014, Thompson had an MRI of her brain and cervical

spine. The MRI showed no specific change from the January 16, 2014

MRIs of her brain and spine.  R. 425-26.

On June 13, 2014, Thompson saw Dr. Salvador Sanchez-Zuniga,

M.D., for depression and anxiety.  R. 381-82.  She reported constant pain.

She was discharged from the Blessing Hospital Pain Service because she

abused her pain medications.  She was unable to focus or concentrate and

said she was "self-medicating" with marijuana.   R. 381.  On examination,

Thompson had a constricted affect and depressed mood.  She made good

eye contact, and she had intact memory, attention, registration, and

concentration.  Her insight and judgment were limited.  She denied any

hallucinations or suicidal or homicidal ideations.  R. 381.  Dr. Sanchez-

Zuniga assessed major depressive disorder, recurrent, without psychotic

features; and anxiety disorder, not otherwise specified.  Dr. Sanchez-

Zuniga adjusted her medication and referred her for counseling.  R. 382.[2]

---

[2] Dr. Sanchez-Zuniga also assigned Thompson a Global Assessment of Functioning (GAF) score of 50.
R. 382.  The GAF score was a measure of a clinician's judgment of an individual's overall level of
functioning on a hypothetical continuum of mental health and illness.  American Psychiatric Assn,
Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text Rev.) (DSM IV-TR), at 32-35.  A GAF

On July 30, 2014, Thompson had x-rays of her lumbar spine.  The x-rays showed "very mild degenerative changes. . . .  Nothing acute."  R. 430.

On August 19, 2014, Thompson saw Dr. Hafez for a follow up on her MS.  R. 470-74.  She was ambulatory and came alone.  She woke up the day before "out of sorts" and with a headache and was stumbling and could not "talk right all day long."  She went to the emergency room at Blessing Hospital.  The emergency room physicians performed a CT scan and x-rays.  All came back normal.  She received an injection of Tylenol and morphine and was sent home.  She reported daily pain due to her back and right thigh.  She also reported that she had pain everywhere and rated her pain as 7/10.  She asked about a TENS unit that the pain clinic had ordered for her.  Thompson said that she had trouble thinking, speaking, ambulating, and keeping her balance.  R. 470, 473.  On examination, Thompson's motor strength was "in fact good," and her sensation was preserved.  She ambulated with a left antalgic gait.  Dr. Hafez noted that her left knee tended to "give way," but "she never falls down."  R. 473.

---

score of 41 to 50 indicated either serious symptoms or any serious impairment in social, occupational, or school functioning.  DSM IV-TR, at 34.  The American Psychiatric Association no longer recommends use of the GAF score.  Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013), at 16.

On September 4, 2014, Thompson had an EEG performed.  The results were "all in all benign" and did not support a diagnosis of a seizure disorder.  R. 435.

On October 19, 2014, Thompson went to the emergency room at Blessing Hospital after she fell down some stairs at work.  X-rays were taken of her ribs and spine.  The x-rays showed no fractures, normal alignment of the thoracic spine, and minimal degenerative changes in the thoracic spine.  R. 614; see R. 458.

On October 24, 2014, Thompson saw her primary care physician Dr. Oluwaseun Odumosu, M.D., for a follow up.  She reported that she fell again at home on October 22, 2014 and injured her foot in this second fall.  She rated her pain at 7/10.  She could bear weight on her foot and she did not feel weaker on her left side.  She also reported that her right thigh had been numb for a year.  R. 458.  Her depression and anxiety were stable and she denied any suicidal ideations.  R. 461.

On examination, Thompson was 5 feet 6.5 inches tall, weighed 201 pounds 4 ounces and had a BMI of 30.16.  R. 463.  Thompson limped on the left.  She had no joint swelling, she had normal muscle strength and tone, and she had no involuntary movements.  She had tenderness in her back.  Thompson's motor examination was normal, and she had equal

movement of all extremities.  She was oriented, her insight and judgment were intact, and her affect was normal.  Her mood was low and anxious.  Dr. Odumosu assessed MS and stable depression.  Dr. Odumosu ordered x-rays of Thompson's foot to rule out fractures and prescribed ibuprofen for the pain.  Dr. Odumosu encouraged Thompson to exercise and lose weight.  R. 461.

On November 5, 2014, Thompson underwent a neuroforaminal block at L4-L5.  R. 618.

On November 7, 2014, Thompson saw Dr. Salvador Sanchez, M.D., for a medication check.  R. 631-32.  On examination, Thompson's appearance, behavior, activity level, orientation, speech, affect, thought process, insight, judgment, and cognition were all normal.  She did not have any suicidal or homicidal ideations, delusions, or hallucinations.  Her psychiatric condition was stable.  R. 632.

On January 7, 2015, Thompson had an MRI of her brain.  The MRI showed no significant change in her MS plaque burden from prior studies.  R. 624-25.

On February 23, 2015, state agency physician Dr. Joseph Kozma, M.D., conducted a consultative examination of Thompson.  R. 566-71.  Thompson told Dr. Kozma that she fell easily and dropped things easily.

She had constant back pain that she rated at a 7/10.  The pain did not radiate.  She also had pain in her left leg and sometimes in her hips.  She estimated that she could walk 20 feet.  Dr. Kozma noted that the medical records said Thompson limped, but she did not limp during his examination.  R. 566. She said that she did not have numbness in her hands, but she had some problems with her memory.  R. 567.  On examination, she had normal strength with no muscle wasting in her upper extremities.  She had normal finger dexterity and 4/5 grip strength and normal muscle development in her lower extremities.  She had no swelling tenderness, or crepitus in any of her joints.  Her spine was not tender, and she had normal muscle tone in her paravertebral muscles.  She had limited range of motion in her lumbar spine.  Her sensory examination was normal and she had no abnormal reflexes.  Her equilibrium was normal and she could heel and toe walk.  Straight leg testing was to 80 degrees bilaterally.  Her gait was normal and her posture was normal with no postural instability.  She did not try to squat.  Mentally, she was oriented, and she spoke normally, her emotional state was stable, her intellectual function was intact, and her thought content and speech were proper.  R. 569-70.

Dr. Kozma concluded that Thompson could perform fine and gross manipulations, her grip strength was 4/5 and her upper body strength was

5/5.  She had good range of motion in her knees and hips and the straight leg testing to 80 degree was "quite satisfactory."  Thompson had some problems with her equilibrium, but she was not dizzy.  Dr. Kozma found that Thompson had a mild problem with her balance sense.  R. 570.

On April 3, 2015, Thompson saw state agency psychologist Dr. Froman for another mental status examination.  R. 634-37.  Thompson reported that she was dealing with her MS.  She also had arthritis in her hips, knees, and back and reported chronic headaches and anemia.  She used marijuana to help with her symptoms.  She denied having seizures and said that she used to pass out but had not done so for at least a year. R. 634.  On examination, Dr. Froman found that little had changed since he last spoke to Thompson.  Dr. Froman administered a personality assessment inventory during this examination.  The personality assessment inventory indicated that Thompson had  significant difficulties, including "a tendency to be somatic, naturally experienced as the result of her MS; physiologically anxious; depressed;  having resentful feelings; borderline personality traits; history of antisocial behaviors supporting her contention that she indeed feels subjectively overwhelmed."  R. 636.  Dr. Froman assessed major depressive disorder, becoming chronic, anxiety

disorder not otherwise specified, and marijuana use.  Dr. Froman

concluded:

> **CONCLUSIONS:**   Janet's low energy level and lethargy, make
> it unlikely that she would be able to perform one or two step
> assemblies at or even near a competitive rate.  She relates
> quite modestly and in a limited way. She appears sheepish,
> shy, and reticent. I believe that she can nevertheless
> understand oral and written instructions and manage benefits.
> She will have significant difficulty managing the stress
> associated with customary employment.

R. 636.  Dr. Froman noted that he reviewed notes from Blessing Hospital

visits on June 13, 2014 and August 12, 2014.  R. 636.

On April 24, 2015, state agency psychologist Dr. Joseph Mehr, Ph.D.,

prepared a Psychiatric Review Technique and Mental Residual Functional

Capacity Assessment of Thompson.  R. 53-54, 57-59.  Dr. Mehr opined

that Thompson had an affective disorder that caused moderate restrictions

in her activities of daily living, moderate difficulties maintaining social

functioning, and mild difficulties maintaining concentration, persistence, or

pace.  Dr. Mehr opined that Thompson had no episodes of

decompensation.  R. 53.  Dr. Mehr reviewed Thompson's medical records

and Dr. Froman's report.  Dr. Mehr stated that Dr. Froman's findings

regarding the severity of Thompson's limitations was not supported by the

evidence in the record.  R. 54.  Dr. Mehr further noted:

CREDIBI LITY ISSUES: The reported impairments could reasonably be expected to be due to the diagnosed disorder, but the described severity of functional impairment appears to be beyond what would be expected given the severity of the symptoms described in the medical evidence.

R. 54.  Dr. Mehr opined that Thompson's mental impairments caused moderate difficulties carrying out detailed instructions and maintaining concentration for extended periods.  She was also moderately limited in her ability to deal with the general public.  R. 58.  Dr. Mehr concluded:

This lady is oriented, does not have marked memory impairment, and she is basically independent in activities of daily living. She has the mental capacity necessary for remembering work locations and general work related procedures.  She also has the cognitive capacity to understand and remember instructions for simple tasks of a routine and repetitive type.

She retains sufficient attention and concentration to persist at and complete work activities for the usual periods of time required in the general work force. To the extent her physical condition allows, this claimant has the capacity for adequate pace and perseverance to maintain a schedule and on time attendance, and she has the capacity to complete a normal work day and work week on a regular basis. She is able to perform at minimally acceptable rates, requiring only the common frequency and lengths of rest breaks. Psychologically based symptoms would not markedly impair her capacity to complete a normal work week.

She has limited social tolerance so she would do best in a socially undemanding and restricted setting that requires only reduced interpersonal contact, away from the general public, but she could relate acceptably with a supervisor and coworkers to the minimally necessary degree.

She retains the capacity to be aware of and self -protective of common hazards. This woman also retains the capacity to utilize public transportation to and from a place of work.

R. 59.

On May 1, 2015, state agency physician Dr. Richard Lee Smith, M.D., prepared a Physical Residual Functional Capacity Assessment.  R. 55-57. Dr. Smith opined that Thompson could:  lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; and never climb ladders, ropes, or scaffolds.  Dr. Smith said that Thompson should avoid concentrated exposure to hazards.  Dr. Smith found no other functional limitations.  R. 56-57.

On August 17, 2015, Thompson completed a "Seizure Questionnaire", a "Pain Questionnaire", and another Function Report-Adult form (Function Report).  R. 221-31.  Thompson said on the Seizure Questionnaire that she had her first seizure in 2012 and she did not have seizures often.  She had four seizures since September 2012.

Thompson wrote on the Pain Questionnaire that her pain began in 2013.  She had pain in her hip, back, and abdomen.  The pain was brought on by standing, walking, and moving around and she had the pain daily. Rest did not relieve the pain and she took oxycodone for the pain.  The medicine made her tired and clumsy.  She had a TENS unit, but "they took it back."  The pain affected her activities beginning in 2014.   She opined

that she could walk half a block, stand for 10 minutes, and sit for one to two hours.  Thompson said she got someone to give her a ride if she needed to run an errand.  She needed help with "cleaning, laundry, pets, seeing what I'm reading."  R. 221-23.

Thompson reported on the Function Report that she had problems concentrating and remembering things.  She had lost her balance, fell, and hurt herself, her hands shook, and her medications made her sleepy.  R. 224.  She watched television during the day and she walked her dogs up and down an alley.  Her daughter helped her walk the dog because the dog pulled Thompson over.  She had trouble sleeping and she had problems keeping her balance in the shower and trouble bending to dress herself. She cut herself shaving and she dropped food while eating because her hands shook.  R. 225.  She needed reminders to take care of her personal needs and to take her medications.  She prepared simple meals on a weekly basis.  Cooking took an hour with breaks and she changed her cooking activity because she got burned and cut "a lot."  R. 226.   She washed dishes and cleaned house two to three times a week.  She needed encouragement to vacuum, mop, and carry laundry, and she did not do yardwork because of the heat.  R. 226-27.  She drove with her husband or daughter in the car.  Her husband did not want her to go out alone because

she tended to lose her balance and fall.  Her husband did the grocery

shopping and she did not remember to pay bills.  R. 227.  She talked to

others on the telephone two to three times a week.  She needed reminders

to go to doctor's appointments and she did not go to the doctor's

appointments alone.  R. 228.  Her impairments affected her ability to lift,

squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs, remember,

concentrate, complete tasks, understand, use her hands, and get along

with others.  She did not follow written instructions well because her

eyesight was worsening and she forgot oral instructions.  R. 229.  She did

not get along with authority figures, and she did not handle stress or

changes in routine well.  R. 230.  Thompson's medications made her

sleepy.  She did not list having a TENS unit on the Function Report.  R.

231.

On August 19, 2015, Thompson saw Dr. Hafez for a follow-up on her

MS.  R.  829-34.  Thompson reported frequent falls, diplopia (double

vision), and being off balance.  She also reported back pain that radiated

into her left lower extremity and she said her memory was "horrible."  On

examination, Thompson was alert and cooperative.  She spoke slowly,

answered slowly, and acted depressed.  She could transfer and ambulate

on her own.  She had a left antalgic gait due to back and leg pain.  Dr.

Hafez assessed MS and by report gait ataxia, falls, and diplopia.  Dr. Hafez planned additional brain imaging to see if her plaque burden had increased. R. 832.

On September 1, 2015, Thompson went to the emergency room at Blessing Hospital with a seizure.  She had a blank stare, headache, and she bit her tongue.  Thompson, however, had not been compliant with her medications.  She had missed recent doses of her seizure medications. She was given Keppra and Motrin and was discharged from the emergency room.  R. 665-66.

On September 14, 2015, Thompson saw Dr. Kozma for another consultative examination.  R. 653-57.  She had numbness in her left leg, foot, and toes and balance problems.  She had pain in her lumbar spine that radiated down her left lower extremity.  She had no problems with her visual acuity.  R. 653.

On examination, Thompson had normal strength and muscle development in her upper and lower extremities.  Her finger dexterity was normal, and her grip strength was 5/5.  She had no joint tenderness, no crepitus, and minimal tenderness in her back.  Thompson's gait and posture were normal with no postural instability.  Heel and toe walking were done clumsily due to poor balance.  She could squat ¾ of the way down.

The range of motion in her lumbar spine was limited.  Her sensory examination was normal and her deep tendon reflexes in her lower extremities were absent.  Her equilibrium was normal.  Dr. Kozma noted that Thompson had some balance problems but no dizziness.  She occasionally had double vision and Dr. Kozma opined that the balance and double vision was due to her MS.  He noted that she had a recent seizure, the second one in her lifetime.  She did not use assistive devices to walk. R. 656-57.

On the next day, September 15, 2015, Thompson went to the emergency room at Blessing Hospital.  She complained of pain in her left side below her breast after she fell on September 9, 2015.  She was admitted to the hospital.  R. 702.  A CT scan of her lumbar spine showed mild facet joint degenerative changes and no acute osseous abnormality. R. 747.

On September 16, 2015, Thompson saw Dr. Luis Zayas-Rodriguez for a consultation.  R. 702-04.  She reported pain in her side and numbness in her toes and the plantar regions of her feet.  She was moving a metal cabinet when she fell on September 9.  X-rays and CT scans taken in the emergency room showed normal results and no fractures.  She reported she had problems with her gait and had a wide based gait.  She had no

double vision or eye pain.  Dr. Zayas-Rodriguez noted "She is actually pretty strong in general."  R. 702.  On examination,  Thompson had 5/5 strength and normal tone in all extremities.  She had decreased sensation in her toes and plantar regions and she had decreased sensation in her left leg.  She said she had the numbness in her leg for a long time.  Her finger to nose coordination was grossly normal and she could stand independently.  She had a wide based gait and fair dynamic balance.  Dr. Zayas-Rodriguez did not think she needed another brain MRI.  Her MRI from two weeks earlier showed that her MS was stable.  Dr. Zayas-Rodriguez also recommended against administering steroids because her paresthesias (numbness and tingling) was not severely painful.  R. 703.

On September 17, 2015, Thompson was released from Blessing Hospital with instructions to use a walker at home while walking if she had pain.  She was not given any additional medications.  R. 705.

On September 29, 2015, Thompson saw state agency psychologist Dr. Froman for a third mental status examination.  R. 647-50.  Dr. Froman assessed chronic major depressive disorder, mild to moderate; panic disorder with agoraphobia; kleptomania and motivated stealing by history; and marijuana abuse—self therapy.  R. 649.  Dr. Froman concluded:

> **CONCLUSIONS:**  Janet tends to move slowly and unsteadily, suggesting that she will have difficulty performing one or two

step assemblies at a competitive rate.  She relates in a
somewhat flattened manner, nevertheless maintaining good
eye contact, suggesting that her depression is not at a "severe
level."

She appears able to understand oral and written instructions
and appears also able to manage cash benefits. Once again, I
believe that she will have difficulty managing the stress
associated with customary employment, not only because of
the psychological aspects of her situation, but certainly because
of the physical aspects.  If indeed she falls, is clumsy, cannot
stand well on her feet, this would pose a significant risk to a
potential employer.

R. 649-50.   Dr. Froman reviewed his April 3, 2015 report in preparation of

this report.  R. 650.

On October 8, 2015, state agency psychologist Dr. Darrell Snyder,

Ph.D., prepared a Psychiatric Review Technique and a Mental Residual

Functional Capacity Assessment.  R. 74-75, 79-81.  Dr. Snyder opined that

Thompson had an affective disorder, anxiety disorder, personality disorder,

and substance additive disorder.  Dr. Snyder further opined that her mental

impairments caused moderate restrictions in her activities of daily living,

moderate difficulties maintaining social functioning, and mild difficulties

maintaining concentration, persistence, or pace.  Thompson had no

episodes of decompensation. R. 74.  Dr. Snyder said that Thompson was

moderately limited in her ability to carry out detailed instructions, maintain

concentration for extended periods of time, work in close proximity to

others, complete a normal workday and workweek without interruptions due

to psychological symptoms, deal with the general public, and respond

appropriately to changes in work settings.  R. 79-80.  Dr. Snyder

concluded:

> She has the mental capacity necessary for remembering work
> locations and general work related procedures.  She also has
> the cognitive capacity to understand and remember instructions
> for simple tasks of a routine and repetitive type.
> She retains sufficient attention and concentration to persist at
> and complete work activities for the usual periods of time
> required in the general work force. To the extent her physical
> condition allows, this claimant has the capacity for adequate
> pace and perseverance to maintain a schedule and on time
> attendance, and she has the capacity to complete a normal
> work day and work week on a regular basis.  She is able to
> perform at minimally acceptable rates, requiring only common
> frequency and lengths of rest breaks. Psychologically based
> symptoms would only rarely impair her capacity to complete a
> normal work week.
> She has limited social tolerance so she would do best in a
> socially undemanding and restricted setting that requires only
> reduced interpersonal contact, away from the general public,
> and others. She retains the capacity to be aware of and self -
> protective of common hazards. This woman also retains the
> capacity to utilize public transportation to and from a place of
> work. However, frustration tolerance is lower and changes
> would be stressful.

R. 80-81.

On October 29, 2015, state agency physician, Dr. LaVerne Barnes,

D.O., prepared a Physical Residual Functional Capacity Assessment of

Thompson.  R. 76-79.  Dr. Barnes opined that Thompson could:

occasionally lift 20 pounds and frequently lift 10 pounds; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday, never climb ropes, ladders, or scaffolds; and frequently balance and stoop.  Dr. Barnes also said that Thompson should avoid concentrated exposure to hazards.  R. 77-78.

On February 26, 2016, Thompson had an MRI of her brain.  The MRI showed no significant change in the disease burden from the prior studies. R. 757.

On May 23, 2016, Thompson saw Dr. Hafez for a follow-up on her MS.  R. 793-98.  Thompson was ambulatory.  She came to the office visit alone.  R. 793.  She complained of severe headaches and an unsteady gait.  She reported bumping her head and body against doorways, tripping, falling down, and injuring her thigh.  She also had blurry vision that was worsening.  Dr. Hafez noted that she needed glasses.  Marijuana helped her headaches and she wanted medical marijuana for her pain, her MS, and her headaches.  R. 796.  On examination, Thompson was 68 inches tall, weighed 192.2 pounds and had a body mass index of 29.21.  She could ambulate on her own, but with an unsteady gait.  She was weak and uncoordinated on the left side.  R. 796.

Thompson died six days later on May 29, 2016.  R. 39.  On July 7, 2016, Thompson's surviving spouse Walter Thompson filed Notice Regarding Substitution of Party Upon Death of Claimant.  Walter Thompson was then substituted in as plaintiff.  R. 15.

## THE ADMINISTRATIVE HEARING

On July 12, 2017, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 35-47.  Walter Thompson and his attorney appeared at the hearing.  R. 37.  Walter Thompson testified that he and Thompson had been married for seven years at the time of her death. They lived together since May 2014.  R. 39.

Walter Thompson testified that Thompson began falling in October 2014 and she fell down two to three times a week.  She would get dizzy, lose her balance, and fall.  She also had problems walking.  R. 40.

Thompson had remitting and relapsing MS.  Walter Thompson said that she would be balanced, but she would then become shaky and then off-balance again.   She also would be coherent and would remember things, but then "she would go through a month or two where she would seem disoriented most of the time."  Her relapses were worse during the summer due to the heat. R. 41.

Walter Thompson said that Thompson had problems with fatigue even when she was in remission.  On a typical day, she would lie down five hours out of an eight-hour day and she slept sometimes while she was lying down.  She also had problems eating when she was depressed.  Walter Thompson said he constantly had to make sure she ate.  R. 42.

Thompson had problems bathing herself and could not maintain her balance while bathing.  Walter Thompson had to monitor when she tried to shower to make sure she did not fall.  He had to be with her when she bathed to help her in and out of the tub.  R. 42-43.

Walter Thompson said that Thompson's youngest daughter Desiree helped Thompson take care of her hair.  Thompson got dressed about two to three times a week.  She did not have the energy to get dressed every day.  R. 43-44.

Thompson had side effects from her medications and would itch and become flush.  She had nausea and vomited about once a week.  R. 45.

Thompson had trouble seeing at night.  She stopped driving because she could not see at night a year before she died.  R. 46.

Walter Thompson completed his testimony, and the hearing then concluded.

## EVIDENCE SECURED AFTER THE HEARING

On August 21, 2017, a medical expert neurologist Dr. Steven Goldstein, M.D., prepared form entitled "Medical Interrogatory Physical Impairment(s)—Adults."  R. 860-62.  The ALJ solicited Dr. Goldstein's answers to the interrogatories as an impartial medical expert.  Dr. Goldstein stated that the record did not contain sufficient evidence to allow Dr. Goldstein to form an opinion about the nature and severity of Thompson's impairments.  Dr. Goldstein stated the medical records did not include the results of a lumbar puncture needed to confirm a diagnosis of MS and that the evidence of Thompson's impairments did not meet or equal a Listing. Dr. Goldstein stated the record did not contain a definitive diagnosis of MS. The MRI was suggestive of MS but there was no clinical history of significant MS attacks and there was no test of spinal fluids.  R. 861.  Dr. Goldstein further opined that Thompson did not have a medically determinable impairment.  R. 862.

On August 25, 2017, Thompson's attorney sent a letter to the ALJ in which he asked the ALJ to send the Medical Interrogatory Physical Impairment(s)—Adults form to Thompson's treating neurologist Dr. Hafez. R. 284.   The ALJ did not do so.

On September 19, 2017, vocational expert Bob Hammond answered written interrogatories from the ALJ regarding Thompson.  The ALJ asked Hammond to assume the person:

> 7. Assume a hypothetical individual who was born on April 24, 1969, has at least a high school education and is able to communicate in English as defined in 20 CFR 404. 1564 and 416.964, and has work experience as [a cook].  Assume further that this individual has the residual functional capacity (RFC) to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except able to lift and/carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk 6 hours of an 8-hour workday; sit for 6 hours of an 8-hour workday; occasionally climb ramps/stairs (no ladders, ropes, scaffolds), occasional balancing, occasional stooping, frequent reaching and handling, no hazards such as dangerous machinery or unprotected heights, simple routine tasks in an occupation that does not require direct communication with the general public.

R. 291.  Hammond opined that such a person could not perform Thompson's prior work as a cook.  R. 291, 293.  Hammond opined that such a person could perform jobs that exist in the national economy, including a rag sorter, with 89,000 such jobs in existence nationally; extrusion press operator, with 127,000 such jobs in existence nationally; and an injection molder, with 121,000 such jobs in existence nationally.  R. 291, 293-94.

On October 31, 2017, Hammond answered additional interrogatories submitted by Thompson.  R. 303-04.  Hammond opined that the person could not work if she had to lie down at work three times a week for 30

minutes each time;  such a person could fall once at work and would lose

employment if she fell again; she could not work if she needed to use a

walker to ambulate; and the person could not work if two to three times a

month her visual acuity was diminished to the point that she could not read

keyboards, buttons, dials, or digital displays.  R. 303-04.

## THE DECISION OF THE ALJ

The ALJ issued his decision on April 2, 2018.  R. 15-28.  The ALJ

followed the five-step analysis set forth in Social Security Administration

Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires

that the claimant not be currently engaged in substantial gainful activity.  20

C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to

have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true,

Step 3 requires a determination of whether the claimant is so severely

impaired that she is disabled regardless of her age, education and work

experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this

requirement at Step 3, the claimant's condition must meet or be equal to

the criteria of one of the impairments specified in 20 C.F.R. Part 404

Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If

the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the

Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Walter Thompson met his burden at Steps 1 and 2.  Thompson had not engaged in substantial gainful activity since her application date, July 14, 2014.  She suffered from severe impairments of MS, degenerative disk disease, epilepsy, and depression.  R. 17-18.  The ALJ determined at Step 3 that Thompson's impairments or combination of impairments did not meet or equal a Listing.  R. 18-20.

The ALJ found that Thompson had the following RFC:

After careful consideration of the entire record, the undersigned finds that the claimant had the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant could never climb ladders, ropes or scaffolds. The claimant could occasionally climb ramps and stairs, balance and stoop. The claimant could frequently reach and handle. She could have no exposure to hazards such as dangerous machinery or unprotected heights. The claimant could perform simple routine tasks in an occupation that did not require direct communication with the general public.

R. 20. The ALJ relied on MRI scans that show Thompson's MS was stable. The ALJ also relied on the consultative examinations of Drs. Leung and Kozma, the opinions of Drs. Smith and Barnes, the opinions of psychologists Drs. Mehr and Snyder, the examinations in the medical records that showed normal strength with no muscle atrophy or spasms, and Dr. Zayas-Rodriguez September 16, 2015 examination in which he observed that Thompson was pretty strong overall. The ALJ also relied on medical records that noted Thompson had normal affect and mood and intact memory and judgment. The ALJ additionally relied on the reports in the medical records that Thompson engaged in the activities of mushroom hunting and moving furniture. The ALJ indicated reliance on Thompson's Function Reports in which she said that she cared for her pets, prepared meals, did laundry, drove a riding lawnmower, drove and shopped regularly, and spent time talking to others on the telephone. The ALJ also

noted that Thompson engaging in mushroom hunting and moving metal furniture was inconsistent with her statements about the effects of her symptoms.  R. 22-25.

The ALJ acknowledged that Thompson had balance problems and fell sometimes and had problems with her hands shaking.  The ALJ noted that Thompson's reports about her balance were inconsistent with the findings in Drs. Leung and Kozma's examinations.  Those doctors found that she had good dexterity, normal strength, and could ambulate.  The ALJ also noted that Dr. Kozma indicated that Thompson appeared to be unsteady, weak, and uncoordinated.  The ALJ found that the limitations in the RFC to a limited range of light work addressed the symptoms supported by the evidence as a whole. R. 21-22.  The ALJ stated:

> By reducing the claimant['s RFC] to a less than full range of light work and including multiple postural and manipulative limitations, for example, providing that she never climb ladders, ropes, or scaffolds, providing that she only frequently reached or handled and limiting her exposure to workplace hazards, these limitations have been reasonably addressed.  The objective medical record does not support a further reduced residual functional capacity or a finding of disabled.

R. 22.

The ALJ's also found that Thompson's statements about her functional limitations  were inconsistent with her Function Reports in which she stated that she prepared meals, mowed the lawn with a riding mower,

Page **38** of **45**

drove, shopped regularly, and spent time with others on the telephone.   R. 25.

The ALJ gave little weight to Dr. Froman's opinions because: (1)  Dr. Froman used the phrase "customary employment" which is not defined in the Social Security regulations of rules; (2) he did not discuss what restrictions would allow Thompson to work; and (3) he based his opinions at least in part on Thompson's physical limitations due to her MS and Dr. Froman was not qualified to opine on functional limitations due to physical impairments.  R. 26.

The ALJ gave little weight to Dr. Goldstein's opinions because he did not opine on Thompson's functional limitations.  R. 26.  The ALJ noted that Thompson's counsel objected to Dr. Goldstein's opinions.  The ALJ overruled the objections because they went to the weight of the evidence. The ALJ further noted that Thompson's attorney asked the ALJ to send interrogatories to Dr. Hafez.  The ALJ found that sending such interrogatories were not necessary to develop the record.  R. 15.

Upon establishing Thompson's RFC, the ALJ determined at Step 4 that Thompson could not perform her prior work as a cook in a restaurant. The ALJ relied on the RFC and the opinions of vocational expert Hammond.  R. 27.

At Step 5, the ALJ found that Thompson could have performed a significant number of jobs that existed in the national economy.  The ALJ relied on the RFC determination; the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2; and the opinion of vocational expert Hammond that a person with Thompson's age, education, experience, and RFC could perform representative jobs of sorter of rags/clothes; extrusion press operator, and injection molder.  R. 28.  The ALJ concluded that Thompson was not disabled prior to her death.  R. 28.

Walter Thompson appealed.  On April 3, 2019, the Appeals Council denied his request for review.  The decision of the ALJ then became the final decision of the defendant Commissioner.  R. 1.  Walter Thompson then brought this action for judicial review.

<u>ANALYSIS</u>

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782

F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2017 WL 5180304, at *1 (October 25, 2017) (originally issued at 2016 WL 1119029 (March 24, 2016)) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms).  The ALJ must articulate at least minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The decision of the ALJ was supported by substantial evidence.  The physical functional limitations in the RFC finding were supported by:  the medical records and imaging that showed her MS to be stable and her spinal impairments to be mild; the opinions of Drs. Smith and Barnes; the findings of Drs. Leung and Kozma in their consultative examinations that found largely normal gait, strength, range of motion in her extremities, and dexterity; and the medical examinations that found steady or normal gait, with normal or near normal strength, and normal range of motion in her

extremities without any joint swelling or muscle spasms.  The mental functional limitations in the RFC finding were supported by:  the opinions of psychologists Drs. Mehr and Snyder; the numerous examinations in the medical records that found intact judgment, insight, thought content;  the examination notes in the medical records that found her depression to be stable; and the evidence that she was not compliant with her medication.

Substantial evidence also supported the ALJ's decision to discount Dr. Froman's opinions that Thompson could not handle customary employment.  The ALJ correctly noted that Dr. Froman based his opinion that she could not work on a combination of Thompson's physical condition with MS and her mental status.  Dr. Froman's conclusions to his examinations, quoted above, support this finding.  Dr. Froman stated in his January 15, 2014 evaluation,  "It is unlikely that Janet would be able to sustain a competitive rate in performing any activities.  In all probability, her work effort would be marred by her limitations in physical function." R. 371 (emphasis added).  Dr. Froman stated in his report from his September 29, 2015 examination, "Once again, I believe that she will have difficulty managing the stress associated with customary employment, not only because of the psychological aspects of her situation, but certainly because of the physical aspects.  If indeed she falls, is clumsy, cannot stand well on

her feet, this would pose a significant risk to a potential employer." R. 649-
50 (emphasis added). These statements provide substantial evidence to
support the ALJ's conclusion that Dr. Froman substantially based his
opinion on Thompson's physical impairments. The ALJ could properly
conclude that, as a psychologist, Dr. Froman was not qualified to render
such opinions. Thompson's arguments to the contrary are not persuasive.

Thompson's counsel argues the ALJ's giving Dr. Froman's opinions
little weight is error. In Thompson's Reply Brief counsel argues that the
Seventh Circuit has reversed for giving the opinions of a psychiatrist little
weight under similar circumstances citing Gerstner v. Berryhill, 879 F.3d
257, 265 (7th Cir. 2018). The psychiatrist involved in Gerstner had treated
the patient thirteen times in two years. In contrast, Dr. Froman treated
Thompson three times in a 20-month period. More importantly, the
opinions of the psychiatrist in Gerstner involved only the assessment of the
mental health of the patient and were not based on the assessment of the
patient's "physical function".

The ALJ, therefore, could and did discount Dr. Froman's opinions.
The ALJ's conclusion on this point was supported by substantial evidence.

Thompson argues that the ALJ's RFC finding did not account for
Thompson's balance problems from her MS, and related problems with her

gait, with repeated falling, and with her double vision.  The Court disagrees.

The ALJ also acknowledged Thompson's limitations due to her MS and in

particular acknowledged Thompson's problems with balance and falling.  R.

21-22.   The ALJ, however, found that the RFC that reduced her capacity to

work to a limited range of light work addressed those issues.  The ALJ

explained  how medical examinations, imaging, and tests supported his

conclusion.  The ALJ met the requirement of minimally explaining the basis

of this aspect of his decision.  <u>See</u> <u>Herron</u>, 19 F.3d at 333.  The Court sees

no basis for reversal on this point.

Thompson complains that the ALJ submitted interrogatories to Dr.

Goldstein after the administrative hearing, but he refused her request to

send the interrogatories to Dr. Hafez.  The Court sees no error.  Courts

uphold the reasoned judgment of the ALJ on how much evidence to gather.

<u>Nelms v. Astrue</u>, 553 F.3d 1093, 1098 (7th Cir. 2009).  In this case, the ALJ

had an extensive record of medical records, including three consultative

physical examinations and three consultative mental status examinations.

Thompson was represented by counsel and is presumed to have presented

her strongest possible case.  <u>See</u> <u>Schloesser v. Berryhill</u>, 870 F.3d 712,

721 (7th Cir. 2017); <u>Nicholson v. Astrue</u>, 341 Fed.Appx. 248, 253 (7th Cir.

2009).  Under these circumstances, the Court cannot say that the ALJ erred in not seeking another opinion from Dr. Hafez.

Thompson argues that the ALJ erred by equating daily activities at home with the ability to perform a full-time job.  The Court disagrees.  The ALJ found that Thompson's statements about her activities were inconsistent.  R. 25.  The ALJ may properly consider the inconsistencies in reports of daily activities in evaluating the weight to give a claimant's statements about the limiting effects of her symptoms.  See SSR 16-3p, 2017 WL 5180304 at *7.  The ALJ did not equate her daily activities with full-time work.  There was no error.

THEREFORE, IT IS ORDERED that Defendant Commissioner's Motion for Summary Affirmance (d/e 19) is ALLOWED, Plaintiff Walter Thompson's Brief in Support of Motion for Summary Judgment (d/e 15) is DENIED, and the decision of the Defendant Commissioner is AFFIRMED. THIS CASE IS CLOSED.

ENTER:   July 20, 2020

_____s/ Tom Schanzle-Haskins_____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE